| | |
|---|---|
| MARY ELLEN TAYLOR,<br>          Plaintiff, | No. 3:16-cv-01754 (SRU) |
| v. | |
| YALE NEW HAVEN HOSPITAL,<br>          Defendant. | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

This lawsuit stems from the termination of Mary Ellen Taylor ("Taylor") from Yale New Haven Hospital ("YNHH" or "the Hospital") on March 31, 2016.  Taylor alleges that her termination from YNHH violated state and federal law.  Specifically, Taylor's Complaint alleges the following claims against the Hospital.

> **Count One**: Reverse Discrimination on the Basis of Race in Violation of Title VII of the Civil Rights Act of 1964;

> **Count Two**: Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964;

> **Count Three**: Retaliation in Violation of Title VII of the Civil Rights Act of 1964;

> **Count Four**: Discrimination on the Basis of Race in Violation of Conn. Gen. Stat. § 46a–60(A)(1);

> **Count Five**: Hostile Work Environment in Violation of Conn. Gen. Stat. § 46a–60(A)(1);

> **Count Six**: Retaliation in Violation of Conn. Gen. Stat. § 46a–60(A)(4);

> **Count Seven**: Retaliation for Exercising FMLA Rights in Violation of 29 U.S.C. § 2601, *et. seq.*

YNHH moves for summary judgment on all of Taylor's claims.  On March 6, 2018, I held a hearing on the Motion for Summary Judgment, at which I took the motion under advisement.

For the following reasons, YNHH'S Motion for Summary Judgment is **granted**.

## I.     Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify

2

which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.    Background

Mary Ellen Taylor is white. Taylor was initially hired by YNHH in May 2001 as a registered nurse. Def.'s Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 1. She was later promoted to the position of nurse coordinator for the neuro-oncology team. *Id*. As nurse coordinator, Taylor's duties included handling new patient intakes, evaluating patient responses, and coordinating with providers and social workers at the outpatient neuro-oncology clinic at YNHH's Smilow Cancer Hospital. Compl. ¶ 13. At all relevant times, Taylor reported to Kathleen Moseman ("Moseman"), Patient Services Manager, and Faith Kozikowski

("Kozikowski"), the Assistant Patient Services Manager. *Id.* ¶ 15. Both Moseman and

Kozikowski are white. Def.'s Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 1.

A. Taylor's Inappropriate Comments

During Taylor's employment at YNHH there were numerous concerns regarding her

workplace communication. In October 2014, Kozikowski met with Taylor after she made a

series of inappropriate comments to a white secretary. *See* Doc. No. 80-1 ("Def's Br.") at 3–4;

Ex. 10 to Taylor Dep., Doc. No. 80-2 at 139. Taylor allegedly told the secretary, "[y]our job

sucks," "[t]hat patient just needs to die," and "[y]ou're never going to get it." *Id.* Those

comments were reported by Deb Reynolds, the Clinical Secretary Supervisor, who is white.

Def's Br. at 3. Kozikowski spoke with Taylor about the alleged comments and directed her to

enroll in effective communication training after Taylor's November 30, 2014 performance

review.[1] Def.'s Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 2.

On May 29, 2015, Moseman and Kozikowski met with Taylor after Kris Overstrum

("Overstrum"),[2] reported that Taylor made her feel uncomfortable and unwelcome. *See* Def.'s

Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 4; Ex. 10 to Taylor Dep., Doc. No. 80-2 at 140–41.

Specifically, Overstrum alleged that Taylor said, "[y]ou [Overstrum] are of no help to me . . . .

You're not valuable . . . . We are not a team . . . . I will not be going to any stupid meetings about

your orientation." Ex. 10 to Taylor Dep., Doc. No. 80-2 at 140; Ex. 12 to Taylor Dep., Doc. No.

80-2 at 142. When confronted with the report, Taylor said that she did not recall uttering those

statements, but if Overstrum "says I did, then maybe I did." Taylor Dep., Doc. No. 80-2 at 46;

---

[1] Taylor refused to sign her November 30, 2014 performance review stating, "I didn't feel as though I needed to register for a class called Achieving Communication Effectiveness . . . my communications skills with my coworkers and the patients were quite up to date and good." Taylor Dep., Doc. No. 80-2 at 8.
[2] Kris Overstrum is a white nurse who was hired to take over Taylor's nursing duties while Taylor served as the nurse coordinator. *See* Def.'s Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 4.

Ex. 12 to Taylor Dep., Doc. No. 80-2 at 142. After the meeting, Moseman informed Taylor that her alleged comments violated the Hospital's Code of Conduct and that if her unacceptable behavior continued YNHH "would pursue progressive discipline . . . that would result in a formal tag on her employee record." Ex. 12 to Taylor Dep., Doc. No. 80-2 at 142.

In August 2015, two African American nurse's aides filed a complaint against Taylor, after she allegedly made a racial remark. When Taylor summoned the two nurse's aides for help moving a patient to an examining table, Taylor stated that the patient tends to get nervous around others and that it is "not because you are black." Taylor Dep., Doc. No. 80-2 at 24; Ex. 13 to Taylor Dep., Doc. No. 80-2 at 143. Kozikowski spoke with Taylor about the complaint and Taylor later apologized. Ex. 13 to Taylor Dep., Doc. No. 80-2 at 144.

B. Taylor's Suspension and Final Warning

The events that led to Taylor's suspension and final written warning arose in October 2015. On October 27, Khaliah Fisher ("Kay" or "Fisher"), a biracial clinical secretary and intake specialist, reported to her department manager that Taylor made racially insensitive comments towards her. Pl's Local Rule 56(a)(1), Stmt., Doc. No. 87-1 at 16. Fisher reported that Taylor came to her work area because there was a patient who asked to meet Fisher.[3] Def's Br. at 6; Fisher Dep., Doc. No. 80-2 at 248. Fisher was apprehensive about meeting that particular patient because of comments the patient made over the phone.[4] Def's Br. at 6; Fisher Dep., Doc. No. 80-2 at 249. When Taylor introduced Fisher to the patient, the patient said, "You're Kay?" and refused to shake Fisher's hand. Def's Br. at 6; Taylor Dep., Doc. No. 80-2 at 20–22. Taylor then led Fisher out of the room and once they were in the hallway, allegedly said "did you see

---

[3] It was not uncommon for patients to request to meet Fisher because patients often spoke on the phone with her multiple times before their admission to the Hospital. *See* Def's Br. at 6.
[4] The patient referred to certain areas of the Hospital as "ghetto" or "hood." Fisher Dep., Doc. No. 80-2 at 249.

the look on her face?  I don't think she expected you to be a ni – a black, a black."  Def's Br. at 6; Fisher Dep., Doc. No. 80-2 at 250.  Fisher went directly to her department manager and reported the incident.  Def's Br. at 7; Fisher Dep., Doc. No. 80-2 at 258.  At her department manager's request, Fisher provided a written account of the incident via email and sent it to Karen Michaels, a member of the leadership team at Smilow Cancer Hospital.  Def's Br. at 7; Fisher Dep., Doc. No. 80-2 at 261.

On October 28, the day after the alleged incident, Fisher reported that Taylor brought her a box of chocolates because she "was sorry for any misunderstanding" the day before.  Def's Br. at 7; Fisher Dep., Doc. No. 80-2 at 261.  Fisher also reported that later in the afternoon Taylor yelled at her for giving a patient the wrong information over the phone.  Def's Br. at 7; Fisher Dep., Doc. No. 80-2 at 262.  Those reports were forwarded to Catherine Lyons, the Executive Director of Patient Services, who asked YNHH Human Resources to conduct a formal investigation of Fisher's allegations.  Pl's Opp., (Doc. No. 87) at 6.

Accordingly, on October 29, Julie Wurcel ("Wurcel"), Senior Employee Relations Specialist for YNHH, and Moseman met with Taylor to discuss Fisher's allegations.  Def's Br. at 7; Taylor Aff., Doc. No. 80-2 at 163.  At the meeting, Taylor "vehemently" denied calling or beginning to call Fisher the N-word.  Ex. 16 to Taylor Dep., Doc. No. 80-2 at 146.  Wurcel then met with Fisher on November 3, where Fisher repeated her version of the incident.  Def's Br. at 7; Ex. 19 to Taylor Dep., Doc. No. 80-2 at 152.  Wurcel also spoke with Moseman and Kozikowski and reviewed their counseling notes relating to Taylor's "documented history of interpersonal conflicts" with her co-workers. Def's Br. at 8; Wurcel Aff., Doc. No. 80-3 at 2.  Wurcel's investigation "revealed a pattern of inappropriate and unprofessional behavior." *Id.*

On November 5, Moseman met with Taylor and informed her that she was being suspended for five days without pay and issued a formal written warning due to the severity of Fisher's allegations and Taylor's history of interpersonal conflict with her colleagues. Def's Br. at 8; Pl's Opp. at 7. When Taylor returned to work on November 16, she was issued a final written warning dated November 11, in connection with the October 27th incident. Def's Br. at 8; Ex. 8 to Taylor Dep., Doc. No. 80-2 at 137–38.[5]

Later that month, Taylor was issued her year-end performance evaluation, dated November 24, 2015. The evaluation included criticism of Taylor's communication skills with her colleagues. *See, e.g*., Ex. 7 to Taylor Dep., Doc. No. 80-2 at 132 ("Mary Ellen does not consistently demonstrate appropriate communication with the members of her team and has refused to speak to her nursing peers unless absolutely necessary. She does not consistently display or demonstrate respect, empathy, enthusiasm and interest in the needs of others."). On December 3, Taylor filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) alleging reverse race discrimination stemming from her suspension and final written warning. Def's Br. at 9; Ex. 25 to Taylor Dep., Doc. No. 80-2 at 159–66. In the complaint, Taylor alleges that YNHH allowed Fisher to retaliate against Taylor by intentionally withholding new patient referrals and essential patient information from Taylor. Pl's Opp. at 11; Ex. 25 to Taylor Dep., Doc. No. 80-2 at 164. Taylor alleges that her complaint regarding Fisher's retaliation was ignored by Kozikowski and YNHH management. Pl's Opp. at 12; Taylor Dep., Doc. No. 87-2 at 49.

---

[5] Taylor formally grieved her suspension on November 18 and again denied that she "nearly" called Fisher the N-word. *See* Ex. 16 to Taylor Dep., Doc. No. 80-2 at 146. On November 30, Taylor's grievance was denied by Lyons. "[A] review of your file also indicates a number of anecdotal notes from your managers addressing concerns brought forth by others about disrespectful, inappropriate and 'bullying' behavior. These reports signify a pattern and despite your denials, they indicate to me that the disciplinary action was justified." Ex. 18 to Taylor Dep., Doc. No. 80-2 at 150.

C. Taylor's Termination

On February 15, 2016, Fisher filed a second complaint regarding Taylor's workplace conduct. Def's Br. at 9; Ex. 17 to Taylor Dep., Doc. No. 80-2 at 149. Fisher's second complaint alleges that Taylor called Fisher a "f**king idiot" and "glorified secretary" at the Hospital.[6] Def's Br. at 10; Ex. 17 to Taylor Dep., Doc. No. 80-2 at 149. In addition, Fisher alleges that Taylor made a series of inappropriate race-related comments about patients: "I didn't know he was black, he spoke so well on the phone" and "I can't stay in the room too long with those types of people." Ex. 17 to Taylor Dep., Doc. No. 80-2 at 149. In response to Fisher's complaint, Wurcel began a second investigation by meeting with Fisher on February 29, 2016, along with other members of YNHH management. Ex. H to Fisher Dep., Doc. No. 80-2 at 272; Wurcel Dep., Doc. No. 80-2 at 276. Due to the severity of Fisher's allegations, Wurcel recommended that Taylor be suspended indefinitely pending further review and investigation. Wurcel Aff., Doc. No. 80-3 at 3.

On March 1, 2016, Taylor met with Wurcel and Kozikowski regarding Fisher's second complaint. Def.'s Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 8. When asked about Fisher's allegations, Taylor denied them, stating that she "never said anything to anybody" and that she would not "open[] [her] mouth near that woman." Ex. 22 to Taylor Dep., Doc. No. 80-2 at 154. Taylor was also informed that she was being suspended indefinitely pending the outcome of the investigation.[7] *Id.* at 155; Wurcel Aff., Doc. No. 80-3 at 3.

---

[6] Fisher's second complaint also reasserts that Taylor called her the "N word." Taylor denies that allegation. *See* Pl's Opp. at 13–14.

[7] On March 7, 2016 while Taylor was suspended, she was granted short-term disability benefits pursuant to the FMLA, based on a diagnosis of PTSD relating to her work environment. Taylor received payment from YNHH for the full sixteen weeks of leave Taylor was eligible for under the FMLA. *See* Ex. 23 to Taylor Dep., Doc. No. 80-2 at 156; Ex. 28 to Taylor Dep., Doc. No. 80-2 at 169.

During her investigation, Wurcel conferred with Moseman regarding Taylor's history of inappropriate workplace behavior. Def's Br. at 10–11; Moseman Dep, Doc. No. 80-2 at 225. After a review of Taylor's entire disciplinary history and Wurcel's investigation of Fisher's second complaint, Moseman decided to terminate Taylor's employment. Def's Br. at 11; Moseman Dep., Doc. No. 80-2 at 223. Lina Pirotti, Head of Human Resources at YNHH, gave final approval of Taylor's termination. Moseman Dep., Doc. No. 80-2 at 226.

Consequently, on March 31, 2016, Taylor was fired from YNHH. Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68. After several unsuccessful attempts to reach Taylor by phone, Moseman sent a letter via certified mail which read in part:

> [o]ver the past two years, you have been counseled on numerous occasions for poor customer relations with co-workers which include making comments that are demeaning, unkind and racially insensitive . . . . In short, your unwillingness to accept accountability for your past behaviors . . . has severely impeded your ability to attain substantial and sustained improvement in these areas. While we recognize your service to our Hospital . . . we can no longer support your employment at Yale-New Haven Hospital.

*Id.* Taylor grieved her termination and again met with Lyons on April 18, 2016. Def's Br. at 11; Ex. 24 to Taylor Dep., Doc. No. 80-2 at 158. Upon further review, Lyons denied Taylor's grievance stating, "[a]s you are aware, your management team, as well as Human Resources, fully investigated the incident which lead to your termination . . . . [I]t is clear that over the past 2 years, you have repeatedly belittled other staff members and created an unkind working environment." *Id.*

Finally, on October 4, 2016, Taylor filed this employment action against YNHH, alleging violations of Title VII, the Family and Medical Leave Act ("FMLA"), and the Connecticut Fair Employment Practices Act ("CFEPA"). Compl. at ¶ 10. Taylor's original nine-count complaint also included claims of Aiding and Abetting Discrimination and Intentional Infliction of

Emotional Distress.  Compl. at ¶¶ 104, 108.  Those claims were later withdrawn.  *See* Doc. Nos. 20, 30.

## III.  Discussion

### A.  Taylor is Unable to Establish a *Prima Facie* Case of Discriminatory Discharge Under Title VII or CFEPA

YNHH's first argument in support of its Motion is that Taylor cannot prove a *prima facie* case of discrimination "because the record is devoid of evidence allowing for the inference that race was the motivating factor in [YNHH's] decision to terminate [Taylor's] employment." Def's Br. at 14.  In addition, YNHH argues that even if Taylor could establish a *prima facie* case of discrimination, she has "failed to adduce evidence sufficient to show that [YNHH's] stated reason for terminating her employment, [which encompassed her] ongoing complaints regarding her behavior, was a mere pretext masking an illicit unlawful motivation."  *Id.*

To support her discrimination claims, Taylor argues that "the colossal absence of . . . any reasonable investigation, demonstrates that YNHH terminated [her], under color of pretextual behavior which manifested itself in the biased investigation that shielded YNHH's true animus towards [her]."  Pl's Opp. at 24.  She also argues that the Hospital's failure to adhere to its own Employee Conduct Policy, which required that Taylor be afforded the opportunity to explain and refute the allegations made against her, demonstrated YNHH's race-based animus towards her. *Id*.

Both parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green* applies to Taylor's discrimination claims under Title VII and CFEPA.  411 U.S. 792 (1973).  The *McDonnell Douglas* framework "is used to determine whether a complainant may prevail on a claim of disparate treatment under state law."  *Dept. of Transp. v. Comm'n*, 272 Conn. 457, 463 n.9 (2005).  Its purpose is to "progressively . . . sharpen the inquiry into the

elusive factual question of intentional discrimination." *Bucalo v. Shelter Island Union Free Sch.*

*Dist.*, 691 F.3d 119, 128 (2d Cir. 2012).

> At the first stage, the plaintiff bears the burden of establishing a *prima facie* case . . . . The requirements to establish a *prima facie* case are minimal. Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.

> At the second *McDonnell Douglas* stage, the presumption created by the *prima facie* case places upon the defendant the burden of producing an explanation to rebut the *prima facie* case—i.e., the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason. However, while the presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff, remains at all times with the plaintiff. If the defendant satisfies its burden of production, then the presumption raised by the *prima facie* case is rebutted and drops from the case.

> At the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision -- a burden that merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.

*Id.* at 128–29 (internal quotations and citations omitted).

Therefore, in connection with Taylor's discrimination claims asserted in Counts One and

Four, she will prevail if she can prove "that [YNHH's] employment decision was based in whole

or in part on intentional discrimination." *Chin v. Port Auth. of New York & New Jersey*, 685

F.3d 135, 151 (2d Cir. 2012). To establish a *prima facie* case of discrimination, Taylor must

prove: (1) she belonged to a protected class; (2) she was qualified for the position she held; (3)

she suffered an adverse employment action; and (4) that the adverse employment action occurred

under circumstances giving rise to an inference of discriminatory intent. *Martinez v. Davis Polk*

*& Wardwell LLP*, 713 F. App'x 53, 54 (2d Cir. 2017).

In this case, YNHH argues that there is no evidence in the record to support an inference

that Taylor's termination from the Hospital occurred due to YNHH's discriminatory intent.

Def's Br. at 16. First, YNHH argues that Taylor fails to identify any African American

comparators, which is required to make a showing of race-based disparate treatment. *Id.* at 17

(citing *Lu v. Chase Investment Services Corp.*, 412 F. App'x 413, 418 (2d Cir. 2011) (finding no

disparate treatment where plaintiff failed to identify a comparator who committed similar

infraction but was not disciplined)). The Hospital states that Taylor has "adduced no evidence

whatsoever even remotely suggesting that any African American comparators engaged in

conduct of comparable seriousness yet were not discharged." *Id.*

Secondly, YNHH states that Taylor presents no evidence to support an inference of

discrimination, either through "invidious comments [made] about others in [Taylor's] protected

group" or through "the sequence of events leading to [Taylor's] discharge." *Id.* (quoting

*Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009)). Taylor does not accuse anyone at

YNHH of making race-based invidious comments. *Id.* In addition, YNHH argues that the

sequences of events leading up to Taylor's firing actually "disproves [Taylor's] claim that she

was dismissed for discriminatory reasons." *Id.* "The chronology of events, particularly

considered in light of the fact that repeated efforts were made—through counseling, training and

progressive discipline—to help [Taylor] improve, eliminates any possible inference that YNHH

discharged [Taylor] for discriminatory reasons." *Id.* at 19.

Finally, the Hospital asserts that because the YNHH staff who fired Taylor were also

members of Taylor's protected class, the Hospital's argument is supported by the "well-

recognized inference against discrimination . . . where the person who participated in the

allegedly adverse decision is also a member of the same protected class." *Id.* (quoting

*Hasemann v. United Parcel Serv. of America, Inc.*, 2013 WL 696424, at *8 (D. Conn. Feb. 26,

2013). In Taylor's case, "every participant in the investigation of [Taylor's] wrongdoing and the

ultimate decision to terminate her employment—namely Ms. Moseman, Ms. Wurcel, Ms.

Kozikowski, and Ms. Lyons—is Caucasian, as well as the race of other complainants." *Id.* at 20.

In response, Taylor argues that she has established a *prima facie* case of discrimination

due to YNHH's deliberate failure to adhere to its own internal Disciplinary Policy when

investigating Fisher's complaints. The Policy required Taylor to have the opportunity to refute

and explain the allegations made against her. Pl's Opp. at 24. Taylor relies on *Rodriguez v. City

of N.Y*, where the court noted:

> where the veracity of the employer's explanation and/or the thoroughness of the
> investigation is disputed, the Court should examine the entire record to determine
> whether there is evidence from which a reasonable jury could conclude that the
> deficiencies in the employer's investigation and/or the incorrect conclusion reached by
> the employer can be attributed to a discriminatory motive.

644 F. Supp. 2d 168, 188 (E.D.N.Y. 2008).

Here, Taylor argues that a jury could conclude that YNHH's "procedurally deficient and

flawed" investigation of Fisher's claims was attributed to the Hospital's discriminatory motive.

Pl's Opp. at 25. Taylor argues that instead of adhering to its own Employee Conduct and

Discipline Policy,[8] the Hospital blindly believed Fisher's version of events over Taylor's, due to

discriminatory motive and animus. *Id.* Taylor argues that an inference of discrimination is

established because of fundamental failures relating to YNHH's investigation. These include the

lack of corroboration of the alleged incidents. *Id.* at 28–29.

In addition, Taylor argues that Fisher herself is an African American comparator to

Taylor. *Id.* at 35. Taylor notes that both she and Fisher filed complaints to Hospital

management, but Fisher's allegations were given more creditability due to YNHH's racial

---

[8] Which required the Hospital to conduct a thorough investigation of the incident, including asking the employee for
an explanation of his/her actions and to meet with the employee to "discuss the alleged offense and obtain [her]
explanation" prior to issuing her a final warning and suspension. Pl's Opp. at 25; Ex. N. to Pl's Opp, Doc. No. 87-5
at 24.

animus. *Id.* Fisher's version of the October 27th incident was unquestionably believed. *See id.* "Notwithstanding receiving two contrasting stories to the same event, and no witnesses to tip the scale in favor of one employee over the other, Taylor was disciplined." *Id.* at 36.

Here, Taylor fails to establish a *prima facie* case of discrimination against YNHH for several reasons.

### 1. YNHH had a Non-Discriminatory Reason to Terminate Taylor

YNHH's decision to fire Taylor was based on Taylor's disciplinary history of making inappropriate comments to her co-workers and not based solely on the alleged incidents involving Fisher. Since October 2014, Taylor has compiled a lengthy record of belittling her colleagues. *See* Taylor Dep., Doc. No. 80-2 at 32–44, Ex. 10 to Taylor Dep., Doc. No. 80-2 at 139–41. In her deposition, Taylor admits to (or does not dispute) making inappropriate statements on the job.[9] *See* Taylor Dep., Doc. No. 80-2 at 36; Ex. 12 to Taylor Dep., Doc. No. 80-2 at 142.

Before her termination, Taylor was put on notice of her poor communications skills. In November 2014, Taylor was directed to enroll in effective communication training after her performance review revealed issues with her communication with colleagues. *See* Def.'s Local Rule 56(a)(1) Stmt., Doc. No. 80-4 at 2; Ex. 7 to Taylor Dep., Doc. No. 80-2 at 132. When Taylor's grievance of her five-day suspension was denied on November 30, 2015, Moseman's letter to Taylor read in part, "a review of your file also indicates a number of anecdotal notes from your managers addressing concerns brought forth by others about disrespectful,

---

[9] For example, when confronted with the October 2014 allegation that Taylor told a department secretary that her job "sucks," Taylor responded by saying "[i]ndeed, I said at times your job will suck. You are brand-new and it will be a one [out of ten] at times and it will be a ten at times." Taylor Dep., Doc. No. 80-2 at 36. Similarly, when confronted with the October 2014 allegation that Taylor said "[t]hat patient just needs to die," Taylor responded by saying "I might have said, [the patient] is suffering so desperately it might be better if they die. That is not for me to say, *but I can say anything I want*." *Id.* at 38 (emphasis added).

inappropriate, and 'bullying' behavior.  These reports signify a pattern and despite your denials, they indicate to me that disciplinary action was justified."  Ex. 18 to Taylor Dep., Doc. No. 80-2 at 150.  Similarly, in Taylor's termination letter, dated March 31, 2016, Moseman stated that "[d]espite receiving complaints from different individuals about several interactions, you have consistently failed to take ownership for any of the reported comments or sentiments regarding your behavior."  Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68.

When considering Fisher's allegations in a light most favorable to Taylor, there remains ample evidence in the record to establish that Taylor was fired from YNHH because of her long history of inappropriate behavior.  Even if Taylor never uttered the "N" word or called Fisher a "f**king idiot," she still had a long history of "making comments that are demeaning, unkind and racially insensitive."  *See id.*  Here, YNHH presents a legitimate, non-discriminatory reason for Taylor's termination.  There is no evidence in the record to suggest that the termination was pretextual.

## 2. YNHH Investigations of Fisher's Complaints Were Thorough

The Hospital's investigations of Fisher's complaints do not give rise to an inference that they were completed in a way to mask racial animus, as suggested by Taylor.  In her Opposition, Taylor repeatedly argues that YNHH's investigations were fatally flawed because they failed to provide Taylor "with any opportunity to refute Fisher's allegations, in violation of YNHH's policy and procedure."  Pl's Opp. at 7.  The record shows, however, that Taylor met with YNHH officials on multiple occasions to tell her side of the story.  For example, after Fisher filed her first complaint against Taylor, Moseman and Wurcel met with Taylor to discuss the complaint on October 29, 2015.  Taylor Dep., Doc. No. 80-2 at 29; Wurcel Aff., Doc. No., 80-3 at 2.  At that meeting, Taylor was appointed a representative and denied calling Fisher the "N" word.  *See*

Taylor Dep., Doc. No. 80-2 at 29.  On November 30, 2015, Taylor met with Lyon to discuss the grievance Taylor filed on November 20, 2015, where Taylor again refuted the allegations made against her.  Ex. 18 to Taylor Dep., Doc. No. 80-2 at 150.  At that meeting, Lyons told Taylor that "[a]s you are aware, because the facts were in dispute, I [] asked for a formal investigation by Human Resources."  *Id.*  That investigation revealed "that there were very different views of the incident in question," but also revealed a pattern of "disrespectful, inappropriate, and 'bullying' behavior."[10]  *Id.*

Even assuming the Hospital's investigations of Fisher's complaints were fatally flawed, there is no evidence in the record to link any failure in YNHH's investigations to racial animus directed towards Taylor.  Taylor does not present any evidence to show that any failure to thoroughly investigate or verify her allegations was motivated by her race.  After a review of the record no "reasonable jury could conclude that the deficiencies in the employer's investigation and/or the incorrect conclusion reached by the employer can be attributed to a discriminatory motive."  *Rodriguez*, 644 F. Supp. 2d at 188.

3.  Fisher is not a Comparator to Taylor.

Taylor also fails to name a legally adequate comparator to demonstrate disparate treatment by YNHH.  "A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Hongyan Lu*, 412 F. App'x at 418.  In her Opposition, Taylor compares herself to Fisher, because they both "engaged in comparable conduct by complaining of each other's

---

[10] The investigation of Fisher's second complaint reached the same conclusion.  "As you are aware, your management team, as well as Human Resources, fully investigated the incident which lead to your termination.  In addition, I [Lyons] had the opportunity to closely examine your disciplinary history . . . . [Your] pattern of poor customer relations with staff members directly contradicts the collaborative and respectful conduct we promote in Smilow Cancer Hospital and cannot be tolerated at this organization."  Ex. 24 to Taylor Dep., Doc. No. 80-2 at 158.

conduct." Pl's Opp. at 35. However, there is no evidence in the record to suggest that Fisher had a similar disciplinary history to Taylor. As stated in Taylor's termination letter, the primary reason for her termination was her pattern of inappropriate behavior. *See* Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68. Even if the Fisher incidents had not occurred, YNHH had several reasons to terminate Taylor. Taylor does not present any evidence of Fisher making similar derogatory comments to co-workers other than her allegation that Fisher retaliated against her by not providing patient information. *See* Pl's Opp. at 11. Therefore, Fisher was not "similarly situated in all material respects" to Taylor. *Hongyan Lu*, 412 F. App'x at 418.

For the reasons stated above, I **grant** summary judgment in favor of YNHH regarding Counts One and Four.

### B. YNHH Articulates a Non-Discriminatory Reason for Taylor's Termination

The Hospital's second argument in support of its Motion is that Taylor cannot prove a *prima facie* case of retaliatory discharge under Title VII or CFEPA because there is "not a shred of evidence suggesting the challenged discharge was rooted in race-based or retaliatory animus." Def's Br. at 14. Taylor "offers nothing . . . indicating that her CHRO complaint engendered ill will on the part of her managers." *Id.* at 20.

Taylor argues that her March 31, 2016 termination was retaliation for her December 3, 2015 and March 4, 2016 CHRO complaints, alleging reverse race discrimination and retaliation. *See* Pl's Opp. at 29–30. "The temporal proximity between [Taylor] filing her amended CHRO Complaint on March 4th and her termination on March 31st, is very short – less than one month. In addition, [Taylor's] original CHRO complaint was filed just three months prior to her termination." *Id.* at 32. "YNHH's retaliation is apparent by its intentional lack of investigation into Fisher's baseless, multiple unverified complaints, resulting in a final warning, five-day unpaid suspension, and termination. The totality of the circumstances, blindly supporting Fisher,

shows YNHH's retaliatory intent and is sufficient to make the requisite showing of a *prima facie* case of retaliatory discharge." *Id.* at 33.

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013). "[B]ut-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (internal quotations omitted).

To establish a *prima facie* case of retaliation under Title VII and CFEPA, Taylor must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.[11] *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).[12]

If Taylor sustains her initial burden, "a presumption of retaliation arises." *Id.* YNHH must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If it does so, "the presumption of retaliation dissipates, and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* Taylor can sustain that burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause if the employer was motivated by retaliatory animus, Title VII is

---

[11] Taylor's burden in this regard is *de minimis*, and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

[12] The elements for a CFEPA retaliation claim are the same. *See Phadnis v. Great Expression Dental Ctrs. of CT, P.C.*, 170 Conn. App. 79, 94–95 (2017).

violated even if there were objectively valid grounds for the [adverse employment action]." *Id.* at 164–65.

In this case, Taylor establishes a *prima facie* case of retaliation due to the temporal proximity between her CHRO filings and her termination. Taylor filed her first CHRO complaint on December 3, 2015, in which she alleged that her November 5, 2015 suspension was rooted in discriminatory animus. Ex. O to Pl's Opp., Doc. No. 87-5 at 36–41. On March 4, 2016, Taylor filed an Amended CHRO Complaint, followed by a Second Amended Complaint on April 12, 2016. Ex. Z to Pl's Opp., Doc. No. 87-6 at 31–33. Thus, two of Taylor's three CHRO complaints were filed before her termination on March 31, 2016. *See* Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68. Therefore, Taylor has proffered admissible evidence for a fact finder to infer that Taylor was terminated because of her CHRO complaints, and a presumption of retaliation arises.

Nevertheless, YNHH articulates a legitimate, non-retaliatory reason for Taylor's termination. As noted above, the record indicates that Taylor was terminated because of her long and detailed history of inappropriate comments, the majority of which occurred *before* Taylor filed her CHRO complaint. *See* Taylor Dep., Doc. No. 80-2 at 34–35; Ex. 10 to Taylor Dep., Doc. No. 80-2 at 139–41; Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68. Notably, the incidents referenced by Kathleen Moseman in Taylor's termination letter, occurred from October 2014 to October 2015, months before Taylor's first CHRO filing on December 3, 2015. Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167. In addition, Taylor was counseled and warned about her workplace behavior before she filed her first CHRO complaint. *See* Ex. 8 to Taylor Dep., Doc. No. 80-2 at 137–38 (noting that Taylor's final written warning was issued on November 11, 2015). Although Taylor establishes a *prima facie* case of retaliation, she provides no evidence

from which a reasonable jury could find that the employer's proffered reason for her termination was a pretext for retaliation.

Accordingly, I **grant** Summary Judgment in favor of YNHH on Counts Three and Six.

## C. There is No Evidence that YNHH Fostered a Hostile Work Environment Towards Taylor

YNHH asserts that Taylor has failed to establish that she worked in a hostile work environment. Under Title VII, a hostile work environment is one in which discriminatory harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). "The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989). "Whether racial acrimony in a particular institution is 'sufficiently pervasive' to constitute a Title VII violation is to be determined from the totality of the circumstances." *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1103 (2d Cir. 1986).

In support of its Motion, YNHH argues that Taylor's hostile work environment claims are based exclusively on the discipline she received following complaints from African American YNHH employees. Def's Br. at 29. However, the Hospital notes that Taylor was also counseled in connection with complaints received from white employees. *Id.* "[Taylor] is entirely at a loss then to explain how it is that YNHH 'harassed' her because of her race simply because it chose to discipline her based on reports of misconduct from employees of both races." *Id*.

In response, Taylor argues that based on the "totality of [the] circumstances," a jury could infer that YNHH fostered a hostile work environment. Pl's Opp. at 40. To support her claims, Taylor recites her previous factual allegations. Namely, that she worked at YNHH without incident for over ten years and "then suddenly [she] was written up, suspended, and terminated,

for allegedly making racist statements, without being afforded the required meeting to refute the allegations" and that "[d]espite the denial of allegations . . . . YNHH sided with Fisher . . . and terminated [her] fifteen-year career at the Hospital." *Id.* Taylor also alleges that YNHH allowed Fisher to retaliate against her by failing to notify Taylor of new patient referrals to the neuro-oncology team, after Taylor filed her CHRO complaints. *See id.* at 10.

Here, Taylor again fails to present evidence from which a "rational juror could infer that a reasonable employee would have found the abuse so pervasive or severe as to alter [Taylor's] working conditions." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012). The evidence fails to show that Taylor was ever harassed at YNHH due to her race. In fact, Taylor's own disciplinary record suggests that YNHH gave her multiple opportunities to change her behavior and remain employed at the Hospital. In November 2015, Taylor was offered the opportunity to enroll in effective communication training to improve her relationship with co-workers. *See* Ex. 7 to Taylor Dep., Doc. No. 80-2 at 132. Taylor was urged to "take all steps necessary to attend a diversity and inclusion class and also to improve [her] relationships with [her] colleagues." Ex. 18 to Taylor Dep., Doc. No. 80-2 at 150. YNHH's Diversity officer, Pat Worthy, was available to speak with Taylor to "discuss perceptions and sensitive workplace communications." *Id.* Even after Fisher's initial complaint (alleging that Taylor called her the "N" word) was investigated, YNHH still allowed Taylor to return to her position as nurse coordinator, following her suspension. *See* Ex. 8 to Taylor Dep., Doc. No. 80-2 at 137.

Because Taylor provides no evidence to show that the harassment she alleges is so severe or pervasive that a reasonable person would find it hostile or abusive, I **grant** summary judgment in favor of YNHH on Counts Two and Five.

D. <u>There is No Evidence to Suggest that Taylor's Termination was in Retaliation for Her FMLA Leave</u>

Finally, YNHH argues that summary judgment should be granted on Count Seven because there is no evidence giving rise to an inference that Taylor's termination was in retaliation for her FMLA-protected leave of absence. "What is blatantly missing [from the record] is so much as a shred of evidence to prove that [Taylor] was terminated not for her pervasive, well-chronicled mistreatment of coworkers, but instead for going out on FMLA leave after she had already been suspended pending investigation." Def's Br. at 32.

On March 7, 2016, Taylor applied for FMLA leave while on indefinite suspension pending the outcome of the investigation of Fisher's second complaint.[13] Pl's Opp. at 19; Ex. AA to Pl's Opp., Doc. No. 87-6 at 38. On March 24, 2016, Taylor's claim was approved, retroactively from March 1, 2016 to April 29, 2016. Pl's Opp. at 19; Ex. BB to Pl's Opp., Doc. No. 87-6 at 40–41. Six days later, Taylor was terminated. *See* Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68. YNHH agreed to pay Taylor's disability through the recommended certification period and she received the full sixteen weeks of leave she was eligible for under the federal and state FMLAs. *See* Ex. 23 to Taylor Dep., Doc. No. 80-2 at 156; Ex. 28 to Taylor Dep., Doc. No. 80-2 at 168.

In her Opposition, Taylor asserts that she "was terminated while she remained out of work on job protected leave due to an approved FMLA serious health condition, which was conceded by Wurcel and Moseman." Pl's Opp. at 20. She also argues that based on the temporal proximity between Taylor's request for FMLA leave and her subsequent termination, the evidence meets the initial burden of an inference of retaliatory intent. *Id*. at 42.

---

[13] Taylor received treatment for Post-Traumatic Stress Disorder in 2016. *See* Ex. 29 to Taylor Dep., Doc. No. 80-2 at 192.

FMLA retaliation claims are also analyzed under the burden-shifting framework set forth in *McDonnell Douglas* 411 U.S. 792 (1973). Under that framework Taylor must establish a *prima facie* case showing "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *McNamara v. Trinity College*, 2013 WL 164221, at *1 (D. Conn. Jan. 15, 2013). If Taylor makes that showing, the burden shifts to YNHH to provide a legitimate, non-retaliatory reason for her termination. If YNHH meets that burden, Taylor must demonstrate that the non-retaliatory reason was actually pretext for retaliation in order to survive summary judgment. To show that the non-retaliatory reason was pretextual, Taylor "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason behind the adverse action." *Gaydos v. Sikorsky Aircraft, Inc*, 2016 WL 4545520, at *9 (D. Conn. Aug. 31, 2016) (internal quotations omitted).

Here, it is undisputed that Taylor was fired from the Hospital while she was on FMLA leave. *See* Ex. 27 to Taylor Dep., Doc. No. 80-2 at 167–68. The temporal proximity between Taylor's request for FMLA and her termination gives rise to an inference of YNHH's retaliatory intent. The Hospital demonstrates however, that Taylor's termination was based on her previous workplace comments. As detailed above, those comments were made before Taylor filed for FMLA leave on March 7, 2016. *See id*. YNHH provides a legitimate, non-discriminatory reason for Taylor's firing, and Taylor fails to present sufficient evidence showing that YNHH's non-discriminatory reasons were false.

Therefore, I **grant** summary judgment in favor of YNHH on Count Seven.

## IV.     Conclusion

For the reasons stated above, I **grant** summary judgment in favor of YNHH on all counts of Taylor's Complaint.  The Clerk shall enter judgment in favor of the defendant and close the case.


So ordered.

Dated at Bridgeport, Connecticut, this 26th day of March 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
